IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

LAKITA BLAIR, LINDA FRASIER, BONNIE WRIGHT, CHRISTOPHER SHULL, CHERYL MAXEY, LAWRENCE D. MEYER, JACOB EVANS, CLAUDE EDMONDS, BRIAN CAREY, JOHN EARLE, KATHLEEN HALL, and OLGA VAYSMAN, Individually and as Class Representatives,

Plaintiffs,

v.

Civ. No. 09-295-SLR

INFINEON TECHNOLOGIES AG, INFINEON TECHNOLOGIES NORTH AMERICA CORP., and QIMONDA AG,

Defendants.

---

Joanne B. Wills, Esquire and Michael W. Yurkewicz, Esquire of Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Wilmington, Delaware. Counsel for Plaintiffs.

David J. Teklits, Esquire and Kevin M. Coen, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Peter J. Macdonald, Esquire of Wilmer Cutler Pickering Hale and Door LLP, New York, New York.

---

**MEMORANDUM OPINION**

Dated: June 29, 2010
Wilmington, Delaware

**ROBINSON, District Judge**

**I. INTRODUCTION**

On April 24, 2009, plaintiffs Lakita Blair, Linda Frazier, Bonnie Wright, Christopher Shull, Cheryl Maxey, Lawrence D. Meyer, Jacob Evans, Claude Edmonds, Brian Carey, John Earle, Kathleen Hall, and Olga Vaysman (collectively, "plaintiffs"), individually and as class representatives,[1] filed the present action against defendants Infineon Technologies AG ("Infineon AG"), Infineon Technologies North America Corporation ("Infineon North America"), and Qimonda AG (collectively, "defendants"). (D.I. 1) Plaintiffs are former employees of the Qimonda North America Corporation and Qimonda Richmond LLC (collectively, "the Qimonda Subsidiaries"),[2] wholly-owned subsidiaries of Qimonda AG. (D.I. 1 at ¶ 1) Plaintiffs allege that defendants, during mass layoffs, violated the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq. ("ERISA") and/or the North Carolina Wage Payment Act, N.C.G.S. § 95-25.22, et seq. ("NCWPCA"), by terminating their employment without severance properly due under the Infineon Group Severance Plan. (*Id.* at ¶¶ 1, 3) Plaintiffs also bring common law claims for breach of contract, fraud, and equitable estoppel and allege that, in many instances, plaintiffs were terminated without proper legal notice due under the Worker

[1] The identities and exact number of plaintiffs in the class are unknown but will be obtainable through discovery. (D.I. 1 at 24 n.7) Currently, counsel for plaintiffs estimates that around 2000 individuals are represented in the class. (*Id.* at ¶ 50) Plaintiffs are further divided into six subclasses, as described in the Discussion section, *infra*.

[2] The Qimonda Subsidiaries are not listed as defendants in the present case because they filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware. *See* D. Del. Bankr. Ct. Civ. Nos. 09-10589-MFW and 09-10590-MFW. The plaintiffs have initiated adversary proceedings against the Qimonda Subsidiaries in the Delaware Bankruptcy Court. (D.I. 1 at 2 n.2)

Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq. (the "WARN Act"), or the California Labor Code § 144, et seq. (the "California WARN Act"). (*Id.*) Plaintiffs seek restitution damages and equitable relief, as well as a declaration that defendants are alter egos and, thus, as a single economic entity, subject to liabilities for employment-related claims brought by former employees of the Qimonda Subsidiaries. (*Id.* at ¶ 44-46) The court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331 and 1367.

Presently before this court is a motion to dismiss (or in the alternative, to stay the action or to require a more definite statement) filed by Infineon AG and Infineon North America (collectively, the "Infineon defendants"). (D.I. 11) For the reasons that follow, the court denies the Infineon defendants' motion to dismiss, or in the alternative, to require a more definite statement.

## II. BACKGROUND

### A. The Corporate Entities

For purposes of the motion to dismiss (or in the alternative, to stay the action or to require a more definite statement), the facts as alleged in plaintiffs' complaint (D.I. 1) are assumed to be true. The defendant corporations in this litigation were formed by a series of "spin offs" or "carve outs" originating with Siemens AG ("Siemens"), a German Corporation that entered the semiconductor industry around 1952. (D.I. 1 at ¶¶ 14, 18) In 1999, Siemens formed Infineon AG and Infineon North America in order to insulate itself from the volatility in the semiconductors market. (*Id.*) Originally, Siemens retained

shares of Infineon*[3] and the new company experienced sharp growth but, after years of cyclical volatility due to falling semiconductor prices, Siemens divested itself of all Infineon* shares in April 2006. (*Id.* at ¶¶ 14-15)

Infineon* operated several facilities in the United States including plants at Richmond, Virginia; Cary, North Carolina; and San Jose, California. (*Id.* at ¶¶ 16, 27) In 2003 and 2005, Infineon* expanded its operations in North Carolina and Virginia, respectively, promising to create new jobs in return for benefits from state and local governments. (*Id.* at ¶¶ 16-17) For example, $9.5 million in benefits were received under North Carolina's "job development" program in return for a promise to create hundreds of new jobs in Cary over the next ten years. (*Id.* at ¶ 16) Virginia state and local government officials also contributed $5 million in the form of site development, training, and tax credits after Infineon* promised to create some 1200 new jobs in Richmond. (*Id.* at ¶ 17)

Following continued market volatility, Infineon* spun off its memory chip operations in May 2006 to form Qimonda AG and the Qimonda Subsidiaries (collectively, the "Qimonda entities"), and employees at the Virginia, North Carolina, and California facilities became employees of the Qimonda Subsidiaries. (*Id.* at ¶¶ 1-2, 18) Infineon* stated at the time that the spin-off was an effort to limit the company's financial exposure in the memory chip market. (*Id.*) Initially, Infineon* retained over 85% of the stock in Qimonda AG, and it also provided Qimonda AG with 565 million EU of

[3] In their motion to require a more definite statement, defendants assert that plaintiffs frequently use "Infineon" without specifying whether they are referring to Infineon AG, Infineon North America, or both. (D.I. 12 at 33) However, because plaintiffs clearly define "Infineon" in their complaint as referring to Infineon AG and Infineon North America collectively (D.I. 1 at ¶ 2), the court will adopt plaintiffs' definition. To avoid confusion, the court will use "Infineon*" where plaintiffs refer to "Infineon" in their complaint.

financing. (*Id.* at ¶¶ 18, 20) Infineon* installed a member of its own Board of Directors, Kin Wah Loh ("Loh"), to serve as CEO for Qimonda*[4] and Chairman of Qimonda*'s Management Board, and it appointed its own General Counsel Michael von Eickstedt ("von Eickstedt") and CFO Peter Fischl ("Fischl") to Qimonda*'s Supervisory Board as well. (*Id.* at ¶ 20) Today, Infineon* holds approximately 77.5% of the shares in Qimonda AG. While von Eickstedt and Fischl no longer serve on Qimonda*'s Supervisory Board, Loh still serves as CEO and Chairman of Qimonda*'s Management Board. (*Id.* at ¶¶ 18, 20)

**B. Allegations Relevant to the Infineon Defendants' Control Over the Qimonda Subsidiaries**

According to its most recent financial statement, Qimonda* had limited ability to obtain financing or make acquisitions due to a lack of independent credit history and Infineon*'s substantial shareholder stake in the company. (*Id.* at ¶ 22) Infineon* also helped recruit employees for Qimonda* positions in the United States without identifying Qimonda* as the employer. (*Id.* at ¶ 27) Infineon* even counted Qimonda*'s employees in its own employee totals and reported Qimonda*'s earnings on its own financial statements until April 2008. (*Id.* at ¶¶ 23, 27)

On March 31, 2008, however, Infineon* announced it would begin classifying Qimonda*'s performance as "discontinued operations" on its consolidated balance

[4] As with "Infineon," defendants assert that plaintiffs frequently use "Qimonda" without specifying whether they are referring to one, some, or all of the Qimonda AG, Qimonda Richmond LLC, and Qimonda North America entities. (D.I. 12 at 33) However, because plaintiffs clearly define "Qimonda" in their complaint as referring to all three Qimonda entities collectively (D.I. 1 at ¶ 2), the court will adopt plaintiffs' definition. To avoid confusion, the court will use "Qimonda*" where plaintiffs refer to "Qimonda" in their complaint. Contrary to defendants' belief, plaintiffs' uses of "Infineon" and "Qimonda" are not ambiguous and do not go so far as to assume the alter ego or "single employer" legal conclusion that plaintiffs seek to establish.

sheets. (*Id.* at ¶ 29) Qimonda* had posted significant losses for the first half of the 2007/2008 fiscal year, and plaintiffs posit that Infineon* no longer wanted to include Qimonda*'s financial performance as part of its own. (*Id.*) Although Qimonda* was classified as a discontinued operation by Infineon*, no steps were taken at this point to notify Qimonda* employees of possible layoffs. (*Id.*) On October 13, 2008, less than three years after Infineon* had announced its expansion plans in the United States, the Qimonda Subsidiaries announced that they would close their Richmond, Virginia facility by January 2009. (*Id.* at ¶ 30) A first group of employees[5] were given proper notice of their employment termination and offered severance under the Infineon Group Severance Plan, which provided for four weeks of base salary and one week of base salary for every year of service, as well as insurance premium payments for three months. (*Id.* at ¶¶ 30, 42) Some employees were persuaded to waive their severance packages with promises of employment at another Qimonda* facility, which promises were never fulfilled. (*Id.* at ¶ 30) Others were given agreements for delayed severance payment, which agreements were never honored. (*Id.*)

Soon after the announced closing of the Virginia facility, Infineon* released its 2008 Annual Report, which announced its new "IFX10+" program regarding job restructuring and eliminations. (*Id.* at ¶ 31) The philosophy of the program (which plaintiffs argue the Infineon defendants failed to follow) includes conducting layoffs "openly" and "in a socially responsible manner" in order to allow time for effected employees to find alternative employment. (*Id.*) On December, 3, 2008, Infineon* publicly warned that Qimonda* was struggling financially and that a Qimonda* shutdown

[5] The complaint categorizes these employees into Classes A and B. (D.I. 1 at ¶¶ 7-8) For detailed classification of the various termination scenarios faced by the plaintiffs, see the Discussion section, *infra*.

could expose it to significant liabilities. (*Id.* at ¶ 33) By now, the Qimonda Subsidiaries were being forced, as "captive sellers," to give 87% of their sales revenue to Qimonda AG in order for Infineon* to "prop up" Qimonda AG for possible sale at the expense of letting the Qimonda Subsidiaries simply "bleed [] dry." (*Id.* at ¶ 36) On December 31, 2008, Infineon* announced a 325 million EU rescue package (including 75 million EU from Infineon* itself) to try to save Qimonda* but, due to "irreconcilable differences" during negotiations, the financing plan never materialized. (*Id.* at ¶¶ 34-35)

The Qimonda Subsidiaries subsequently closed their facilities in North Carolina, Virginia, and California and filed for bankruptcy on February 20, 2009.[6] (*Id.* at ¶¶ 1-2, 16-17, 40) Infineon* expressed "sincere regret" regarding the closings, but no notice was provided to the remaining employees who were terminated and no arrangements were made for proper payment of severance agreements. (*Id.* at ¶ 38) Following the closings, on April 1, 2009, the Qimonda Subsidiaries announced that some of their funds would be used to provide for terminated Qimonda AG employees,[7] but no comparable concern was shown for their own terminated employees. (*Id.* at ¶ 41) As a result of the plant shutdowns and mass layoffs, plaintiffs allege they were terminated without severance, and many contend they were not given proper legal notice under either the WARN Act or the California WARN Act.[8] (*Id.* at ¶¶ 1, 7-12) Based on the alleged interconnectedness among Infineon AG, Infineon North America, Qimonda AG,

[6] Qimonda AG later filed for bankruptcy protection in Germany on January 23, 2009. (D.I. 1 at ¶ 37)

[7] Qimonda AG employees were to be paid up to 77% of their former wages and given training for four and a half months. (D.I. 1 at ¶ 41) Infineon* also contributed funds for terminated Qimonda AG employees. (*Id.*)

[8] The WARN Act requires an employer with one hundred or more employees to provide its employees with sixty-days notice before a plant closing or mass layoff, absent a showing of unforeseeable business circumstances or other applicable defenses. 29 U.S.C. §§ 2102(a), 2103.

and the Qimonda Subsidiaries, plaintiffs assert that defendants should be treated as an alter ego or single employer and should be held liable for the injury to former employees of the Qimonda Subsidiaries. (*Id.* at ¶¶ 21, 44, 65-68)

**III. STANDARD**

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in its favor. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public record, orders, and attached exhibits. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* Furthermore, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.*

## IV. DISCUSSION

### A. Classes and Claims

Plaintiffs are categorized into six classes, designated as Classes A through F, based on the alleged situations surrounding their employment termination. (D.I. 1 at ¶¶ 7-12) These classes are not mutually exclusive. Class A and B plaintiffs were properly given legal notice of termination and were offered severance and insurance premium coverage pursuant to the terms of a written agreement under the Infineon Group Severance Plan. (*Id.* at ¶¶ 7-8) However, Class A plaintiffs were never provided these severance payments, and Class B plaintiffs were misled into declining these severance payments in return for false promises of employment at another facility. (*Id.*) Class C plaintiffs were offered neither severance nor premium coverage and were not provided with sixty-day notice of termination. (*Id.* at ¶ 9) Class D plaintiffs were similarly denied severance and premium coverage but worked in California, where additional statutory requirements of termination notice apply under the California WARN Act. (*Id.* at ¶ 10) Class E plaintiffs were given agreements promising payments of wages, salary, vacation pay, benefits and bonuses, which agreements were not honored. (*Id.* at ¶ 11) Class F plaintiffs worked in Cary, North Carolina; they were denied severance, benefits, salary, deferred compensation, vacation payments and bonus payments under the NCWPCA. (*Id.* at ¶ 12)

Class A plaintiffs bring claims for breach of contract and violation of ERISA; Class B plaintiffs claim fraud, equitable estoppel, and violation of ERISA; Class C plaintiffs claim breach of contract, violation of the WARN Act, and violation of ERISA; Class D plaintiffs claim violation of the California WARN Act; Class E plaintiffs claim

breach of contract and violation of ERISA; and Class F plaintiffs claim violation of the NCWPCA.[9] (*Id.* at ¶¶ 69-152)

**B. Parties' Arguments**

Plaintiffs allege that, up to the time of the plant closings, the Infineon defendants (Infineon AG and Infineon North America) continued to run and control Qimonda* as "[their] own internal division" and reaped benefits from this arrangement, to the detriment of Qimonda*. (*Id.* at ¶¶ 21-22) As a result, they argue, the corporate veil should be pierced and defendants should be treated as an alter ego or "single employer," liable for plaintiffs' back pay and benefits. (*Id.* at ¶¶ 13, 21, 44, 65-68) To support this assertion, plaintiffs point to a high interdependency of business operations in the form of formal and informal consolidation of financial, strategic, legal, and human resources operations. (*Id.* at ¶¶ 21, 66)

In their motion to dismiss, the Infineon defendants argue that plaintiffs fail to adequately plead any theory of derivative liability. (D.I. 12 at 7) Specifically, they contend that: (1) plaintiffs' complaint fails to allege that the Qimonda Subsidiaries were established for the purposes of committing fraud or visiting injustice upon plaintiffs; (2) plaintiffs' complaint does not invoke enough of the factors identified by the Third Circuit to warrant piercing of the corporate veil under alter ego doctrine; and (3) plaintiffs' complaint fails to plausibly allege that the Infineon defendants constitute a "single employer" with the Qimonda Subsidiaries, under the WARN Act. (*Id.* at 7-8, 12, 19) The Infineon defendants assert that the federal alter ego test for piercing the corporate

[9] To summarize, breach of contract claims are bringing brought by Classes A, C, and E; fraud and equitable estoppel by Class B; violation of ERISA by Classes A, B, C, and E; violation of the WARN Act by Class C; violation of the California WARN Act by Class D; and violation of the NCWPCA by Class F. (D.I. 1 at ¶¶ 69-152)

veil is a stringent one and that, in the present case, plaintiffs cannot justify the piercing of the veil between the Qimonda Subsidiaries and Infineon defendants. (*Id.* at 8-9) Furthermore, they contend that plaintiffs' pleadings do not plausibly allege the Qimonda entities and Infineon defendants had become so entangled in each others' affairs as to be considered a "single employer" under the WARN Act. (*Id.* at 12, 19)

**C. Plaintiffs Have Sufficiently Alleged Alter Ego Liability**[10]

It is a general principle of corporate law "deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). In certain situations, however, the corporate veil can be pierced, as a tool of equity, to disregard the existence of a corporation and impose liability on the corporation's individual principals and their personal assets. *See, e.g.*, *Bd. of Tr. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002); *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir. 1979). The alter ego doctrine for piercing the corporate veil allows derivative liability to be placed upon a corporation's individuals. *Bestfoods*, 524 U.S. at 64. Here, plaintiffs have sufficiently alleged alter ego liability by asserting that the Infineon defendants exercised control over the Qimonda entitities as a single entity and by alleging an element of fraud or injustice.

"In order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that, in all aspects of the business, the [] corporations actually functioned as a single entity and should be treated as such." *Pearson v. Component Tech. Corp.*,

---

[10] Plaintiffs list "alter ego" as a separate claim in their complaint. (D.I. 1 at ¶ 65-68) However, "[p]iercing the corporate veil is not itself an independent [] cause of action, but rather is a means of imposing liability on an underlying cause of action." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996).

247 F.3d 471, 485 (3d Cir. 2001). An alter ego relationship may arise where "a corporate parent exercises complete domination and control over its subsidiary." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989). Various jurisdictions apply slightly different alter ego tests, but one of the "most important differences [] seem[s] to reside largely in . . . whether an element of fraudulent intent, inequitable conduct, or injustice is explicitly required []." *Pearson*, 247 F.3d at 484 n.2; *see also United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1093 (1st Cir. 1992) (requiring only that "the parent corporation . . . acted in a blameworthy manner" for a finding of fraud in alter ego analysis); *Lumpkin v. Envirodyne Industries, Inc.*, 933 F.2d 449, 463 (7th Cir. 1991) (requiring proof of fraud or injustice akin to intentional wrongdoing in its alter ego test). Whether or not the alter ego test requires an element of fraudulent intent "is demonstrably an inquiry into whether the . . . corporation is little more than a legal fiction."[11] *Pearson*, 247 F.3d at 485. This court has required an element of fraudulent intent in its alter ego test, as well as the traditional requirement that the corporation and its subsidiaries operated as a single economic entity (the "single entity test").[12] [13] *Trevino v. Merscorp, Inc.*, 583 F.

[11] The parties' briefs occasionally refer to separate state and federal alter ego tests without specifying how the alter ego test is different under state law. The alter ego analysis is in fact the same under state or federal law because "[v]eil piercing is not dependent on the nature of the liability. Under both state and federal common law, abuse of the corporate form will allow courts to employ the tool of equity known as veil-piercing." 18 Francis C. Amendola et al., C.J.S. Corporations § 14 (2010).

[12] *Trevino* uses the language "shareholders" instead of "subsidiaries" but, for purposes of the single entity test, the same principles apply to corporation/shareholders and parent/subsidiaries. *See Laifail, Inc. v. Learning 2000, Inc.*, 2002 WL 31667861, at *11 (D. Del. Nov. 25 2002).

[13] Plaintiffs argue that the federal alter ego test should instead focus on the management's labor policy and whether the parent has controlled the conduct that led to the alleged violation of law. (D.I. 17 at 25) This view, called the "integrated enterprise" test, was developed by the National Labor Relations Board ("NLRB") to address alter ego liability in labor relations, such as determining whether two firms are

Supp. 2d 521, 528 (D. Del. 2008); *see also SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, Civ. No. 04-1199, 2005 WL 851126, at *3 (D. Del. Apr. 13, 2005). Under the single entity test, the Third Circuit has considered seven factors in determining whether a corporation operated as a single economic entity: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporations at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) whether the corporation is merely a facade. *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981) (approving the federal alter ego factors used by the 4th Circuit in *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686-87 (1976)); *see also Trustees of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003). While the list of factors is not exhaustive and no single factor is dispositive, some combination is required, and an overall element of fraud, injustice, or unfairness must always be present. *Trevino*, 583 F. Supp. 2d at 529 (citing *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988)).

For reasons of public policy, the alter ego standard for piercing the corporate veil is often more lenient for causes of action arising under ERISA, a federal statute, than state law. *See United Elec., Radio & Mach. Workers of Am.*, 960 F.2d at 1092 ("In an ERISA case, the applicable federal standard can sometimes be less rigorous than its state common law counterparts. The rationale . . . is grounded on [sic] congressional intent."); *Lumpkin*, 933 F.2d at 460-61 ("The underlying congressional policy behind

---

sufficiently related to meet NLRB's minimum amount of business standard and whether a firm constitutes a neutral entity in the context of a secondary boycott. *See Pearson*, 247 F.3d at 486-87. Because the present case involves application of corporate law and extends beyond NLRB's reach, the "integrated enterprise" test is inapplicable and this court will use the Third Circuit's test.

ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits."); *Alman v. Danin*, 801 F.2d 1, 4 (1st Cir. 1986) ("Allowing [the parent] of a marginal [undercapitalized subsidiary] to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefits plans, would seem to be precisely the type of conduct Congress wanted to prevent."). The seven "single entity" factors used by the Third Circuit apply in Delaware regardless of whether the cause of action is based on federal or state law. *See In re Foxmeyer Corp.*, 290 B.R. 229, 236 (D. Del. Bankr. 2003) (using the "single entity" factors the Third Circuit first outlined in *Pisani*, 646 F.2d 83, *infra.*) However, the required element of fraud or injustice differs slightly between federal and state causes of action in Delaware. Under Delaware law, the requisite injustice or unfairness is not that the parent corporation committed an actual fraud or sham but just "something that is similar in nature to fraud or a sham." *In re Foxmeyer*, 290 B.R. at 236. The court in *In re Foxmeyer* "view[ed] as largely superficial the difference in the parties' positions as to what must be shown in order to pierce a corporate veil under Delaware law – fraud **or something like it is required**." *Id.* (citation omitted). Meanwhile, the fraud, injustice, or unfairness requirement under federal law was clarified in *Lutyk*, in which the Third Circuit held that no **actual** fraud is required to pierce the corporate veil, merely an **element** of injustice or fundamental unfairness. *Lutyk*, 332 F.3d at 194.[14]

[14] The court in *Lutyk* noted that when the conduct alleged "is that the corporation as a whole is a sham or facade, a finding akin to fraud is necessary." 332 F.3d 188, 194 n.7 (citations omitted). As plaintiffs have not alleged that the Qimonda entities were, as a whole, a sham or facade, no showing of actual fraud is required.

The question at bar is not whether plaintiffs' claims will ultimately succeed on their merits, but whether the facts as pled are sufficient to warrant discovery. In support of their contention that the Infineon defendants were the alter ego of the Qimonda Subsidiaries, plaintiffs have alleged the following: (1) Infineon* used the term "Infineon Group" in its most recent 2009 corporate profile to refer to entities under its direct control, including the Qimonda entities (*Id.* at 3 n.4); (2) in a 2008 filing, Infineon* stated that "Infineon Technologies AG is the parent company of the Infineon Group and carries out the group's management and corporate functions" (*Id.*); (3) Infineon* continues to retain 77.5% of the stock in Qimonda AG, limiting Qimonda*'s ability to obtain financing (*Id.* at ¶¶ 18, 22); (4) at the time of the spin off, Qimonda* received approximately 565 million EU in financing from Infineon* (*Id.* at ¶ 20); (5) Infineon* installed three of its own officers or board members to officer or board member positions at Qimonda* (*Id.*); (6) Infineon* provided "general support services" to the Qimonda entities like logistics services, sales support, purchasing services, human resources services, facility management, patent support, legal services, strategy services, and financing, accounting, and treasury support (*Id.* at ¶ 21); (7) Infineon* reported the Qimonda entities' earnings and losses on a consolidated basis in its own financial statements until April 2008, when it classified the Qimonda entities as "discontinued operations" (*Id.* at ¶ 23); (8) Qimonda* was expected to use Infineon*'s fabrication facility in Germany, buy Infineon*'s products, and pay severance to Infineon* employees (*Id.* at ¶ 25); (9) employee recruitment was shared between Infineon* and Qimonda* (*Id.* at ¶ 27); (10) Infineon* counted Qimonda*'s employees in its annual report (*Id.*); (11) plaintiffs' severance plans were under the Infineon Group Severance Plan (*Id.* at ¶ 30); (12) in

late 2008, Infineon* arranged a 325 million EU "rescue package" for Qimonda* that was never delivered (*Id.* at ¶¶ 34-35); (13) in 2008 and 2009, Infineon* siphoned funds from the Qimonda Subsidiaries by forcing them to give 87% of their revenue to Qimonda AG, in an effort to prop up Qimonda AG for possible sale (*Id.* at ¶ 36); and (14) there is an "overall element of injustice" because Infineon* mishandled or misdirected funds and prevented Qimonda* from honoring obligations to their employees (*Id.* at ¶ 67).[15]

Viewing the allegations in the light most favorable to the non-moving party, plaintiffs have pled the following factors of the "single entity" test under alter ego doctrine: gross undercapitalization; failure to observe corporate formalities; insolvency; and siphoning. Although some of plaintiffs' allegations, such as royalty-free patent licensing and stockerholder interest, are consistent with the parent/subsidiary relationship,[16] their other allegations also give rise to the inference that the Infineon defendants created a facade by exercising significant control over the Qimonda Subsidiaries' operations, finances, and the ultimate decision to close their plants in the United States. While plaintiffs do not allege non-payment of dividends or absence of corporate records, the seven "single entity" factors only outline useful considerations for

---

[15] In their response brief (D.I. 17), plaintiffs allege new facts not contained in the complaint, specifically, that: (1) recruiting of employees was shared between Infineon* and the Qimonda entities throughout the layoffs and closures; (2) Fischl remained as Chairman of the Qimonda AG board following April 2008; (3) Reinhard Ploss served on both the Infineon* and Qimonda* boards; (4) the interconnectedness between entities was a non-arms-length transaction slated to remain in effect through at least September 2009; and (5) Infineon* showed charts lumping the Qimonda entities' employees with other Infineon* employees as part of an overall "production" function. (D.I. 17 at 5 n.5, 7 n.7, 9 n.11, 10 n.13) Because these facts are not contained in the complaint, they will not be considered in adjudging the sufficiency of the pleadings and, in any event, do not change the result of the motion to dismiss.

[16] The Infineon defendants concede the parent/subsidiary relationship between the Qimonda entities and Infineon defendants. (D.I. 12 at 1)

the court. No single element is dispositive, and the absence of one or two factors may be sufficiently outweighed by the other considerations when balanced on whole.[17]

Furthermore, plaintiffs' pleadings are sufficient to support an inference that the Qimonda entities and Infineon defendants operated in an alter ego relationship because plaintiffs have sufficiently alleged the requisite fraud or injustice. The fraud or injustice that must be demonstrated in order to pierce a corporate veil must "be found in the defendants' use of the corporate form."[18] *In re Foxmeyer Corp.*, 290 B.R. at 236 (quoting *Mobil Oil*, 718 F. Supp. at 267). If plaintiffs' allegations are true – that the Infineon defendants misdirected funds, exercised crippling control, and purposely siphoned profits from the Qimonda Subsidiaries in favor of propping up Qimonda AG – then plaintiffs have sufficiently alleged that the Infineon defendants may have perpetrated an element of fraud or injustice in their use of the corporate form under both the federal alter ego standard (element of fraud or injustice) and the state alter ego standard (something similar to fraud or injustice). Plaintiffs have sufficiently pled the requisite factors for alter ego liability of the Infineon defendants beyond mere speculation or recitation of the elements. The nature and extent of the dominion and control exercised by the Infineon defendants over the Qimonda Subsidiaries is a

---

[17] The court is not substantively engaging in the "single entity" balancing test at this time; it only finds that plaintiffs have alleged sufficient facts to proceed under this test after discovery.

[18] Plaintiffs also allege that injustice would result from the Qimonda entities' bankruptcy and inability to shoulder the potential liability to plaintiffs. "However, Delaware courts have held that the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil." *Trevino*, 583 F. Supp. 2d at 530.

question of fact, not subject to resolution on a motion to dismiss. *See In re Buckhead America Corp.*, 178 B.R. 956, 974-75 (D. Del. 1994).

**D. Plaintiffs Have Sufficiently Alleged "Single Employer" Liability Under the WARN Act**

The WARN Act defines an employer as "any business enterprise" that employs one hundred or more employees. 20 C.F.R. § 639.3(a). In order for plaintiffs to recover damages from the Infineon defendants related to the unnoticed plant closings, they must establish that the Infineon defendants were a single "business enterprise" or single employer with the Qimonda Subsidiaries. *See Pearson*, 247 F.3d at 482. The standard for inter-corporate liability under the WARN Act rests on whether the relevant companies have become "so entangled with [one another's] affairs" that the separate companies "are not what they appear to be, [and] in truth they are but divisions or departments of a single enterprise." *NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982) The Department of Labor ("DOL") has explicitly promulgated relevant factors for courts to use when considering whether to impose derivative liability under the WARN Act on an affiliated corporation: (1) common ownership; (2) common directors and/or officers; (3) de facto exercise of control; (4) unity of personnel policies; and (5) dependency of operations. *See* 20 C.F.R. § 639.3(a)(2). These DOL factors are similar to those of the "single entity" analysis under the federal alter ego test, but conflicts within existing case law have resulted in various jurisdictions applying slightly different tests for liability under the WARN Act. *Pearson*, 247 F.3d at 477. In *Pearson*, a suit brought by employees against an employer's creditor for damages under the WARN Act for the employer's unnoticed plants closures,

the Third Circuit concluded that the appropriate test for corporate veil piercing under the WARN Act consists of the DOL factors. *Id.* at 478 ("The DOL's instruction that courts apply 'existing law' was not intended to undermine the force of its own regulation on the subject, but was instead intended to instruct courts that existing precedent applying other tests . . . may be useful and appropriate to resolve analogous questions arising under the WARN Act."). The factors, however, "are not balanced equally: the first and second factors, common ownership and common directors and/or officers, are not sufficient to establish that two entities are a single employer." *In re APA Transport Corp.*, 541 F.3d 233, 243 (citing *Pearson*, 247 F.3d at 494).

Plaintiffs and the Infineon defendants agree that the five DOL factors are the correct test for determining whether corporations are a "single employer" under the WARN Act. (D.I. 12 at 19; D.I. 17 at 15) In support of their claim that the Infineon defendants should be liable under the WARN Act as a "single employer," in addition to the facts identified above, plaintiffs have also pled that, despite Infineon* classifying Qimonda* as a "discontinued operation," no steps were taken to give some of the employees sixty-days notice of the plant closings as required under the WARN Act. (D.I. 1 at ¶ 29)

For the first two factors, plaintiffs allege that Infineon* and Qimonda* shared common ownership through Infineon*'s stock holding, and plaintiffs also explicitly list three common officers: Loh; von Eickstedt; and Fischl. (D.I. 1 at ¶¶ 18, 20, 22) The third factor, de facto exercise of control, involves whether one company "was the decisionmaker responsible for the employment practice giving rise to the litigation." *APA Transport*, 541 F.3d at 245 (quoting *Pearson*, 247 F.3d at 503-04). Plaintiffs allege

that Infineon* made the decision to force the Qimonda Subsidiaries out of business and to close their facilities, so they sufficiently pled the third factor. (*Id.* at ¶ 36) Factor four looks to whether there was a unity of personnel policies, that is, whether the companies "actually functioned as a single entity with regard to [their] relationship[] with employees." *APA Transport*, 541 F.3d at 245 (quoting *Pearson*, 247 F.3d at 499). Plaintiffs allege that Infineon* shared recruitment, employee totals, and umbrella benefit and severance plans with the Qimonda Subsidiaries. (D.I. 1 at ¶¶ 21, 27, 30-31, 42) Finally, courts look to the "existence of arrangements such as the sharing of administrative or purchasing services, interchanges of employees or equipment, and commingled finances" when analyzing the fifth factor – dependency of operations. *APA Transport*, 541 F.3d at 245 (quoting *Pearson*, 247 F.3d at 500 (citations omitted)). Plaintiffs' allegations of financing dependency, consolidated financial reports, and siphoning of funds sufficiently pled this fifth factor. (*Id.* at ¶¶ 22-23, 36, 67)

**V. CONCLUSION**

For the aforementioned reasons, the court denies the Infineon defendants' motion to dismiss and motion to require a more definite statement (D.I. 11).[19] The Infineon defendants did not address any of the substantive common law claims or substantive issues arising under ERISA, the WARN Act, the California WARN Act, or the NCWPCA. As such, the court has not addressed those substantive issues and will not do so until after discovery is completed.[20]

---

[19] Footnotes 3 and 4, *supra*, discuss defendants' motion to require a more definite statement.

[20] As both parties have expressed a desire to avoid duplicative litigation, the court shall conduct a telephonic status conference on the motion to stay this action pending a determination of the underlying claims in the Qimonda Subsidiaries' bankruptcy action.